## LAW v. UNITED STATES.

(District Court, D. Montana. July 13, 1923.)

No. 1016.

1. **Army and navy ⬅51½, New, vol. 12A Key-No. Series—War risk insurance construed as other contracts.**

The War Risk Insurance Act in its insurance feature was intended to afford the soldier the advantage of the ordinary life and accident insurance which was no longer reasonably available to him, and, being a substitute for such insurance, the government contracts are to be construed by the same rules as like contracts involving none but private parties.

2. **Army and navy ⬅51½, New, vol. 12A Key-No. Series—"Total permanent disability" under War Risk Insurance Act defined.**

The term "total permanent disability," as used in War Risk Insurance Act, art. 4, § 2 (Comp. St. Ann. Supp. 1919, § 514u), must be taken in a reasonable and practical (perhaps even liberal) sense relative to the status of the beneficiary and to be determined largely by the circumstances of his particular case.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Totally and Permanently Disabled.]

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Army and navy ☞51½, New, vol. 12A Key-No. Series—Factors in determining extent of disability for purposes of war risk insurance stated.**

In determining as a question of fact the extent of disability under War Risk Insurance Act, the inquiry is not to be restricted to the vocation the soldier may have followed, but extends to any other gainful vocation that it is reasonably probable that he can follow with reasonable effort and success, but if he is wholly and permanently incapacitated from following his former vocation, speculation or conjecture that he might successfully follow some other cannot be resorted to as basis for a finding that the case is not one of total permanent disability.

4. **Army and navy ☞51½, New, vol. 12A Key-No. Series—War risk insurance; regulation of bureau held not to correctly define total permanent disability.**

The regulation made by the Director of the Bureau of War Risk Insurance in March, 1918, providing that any impairment of mind or body which renders it "impossible" for the disabled person to follow any gainful occupation shall be deemed total disability, and deemed to be permanent whenever it is founded on conditions which render it "reasonably certain" that it will continue throughout life, imposes limitations upon the term "total permanent disability" as used in War Risk Insurance Act, art. 4, § 2 (Comp. St. Ann. Supp. 1919, § 514u), which are destructive of the spirit of the act and cannot be accepted as a correct definition of the term.

5. **Army and navy ☞51½, New, vol. 12A Key-No. Series—War risk insurance contract not affected by subsequent amendment of statute.**

Act Dec. 24, 1919, § 11, amending War Risk Insurance Act by providing that certain injuries or conditions shall be deemed to be total permanent disability, does not limit total permanent disability under prior contracts to the injuries or condition specified.

6. **Army and navy ☞51½, New, vol. 12A Key-No. Series—Soldier held to have suffered "total permanent disability."**

A soldier who was permanently disabled from following his former vocation by shell wounds, which caused loss of his left arm, loss of some tissue from his thigh permanently disabling his leg to some extent, and neurasthenia, probably not permanent, *held* to have suffered total permanent disability, within the intent and meaning of War Risk Insurance Act, art. 4, § 2 (Comp. St. Ann. Supp. 1919, § 514u).

7. **Army and navy ☞51½, New, vol. 12A Key-No. Series—Acceptance of vocational training does not deprive soldier of right to insurance.**

Acceptance by a soldier who has suffered total permanent disability in the service of vocational training at the expense of the government does not deprive him of the right to the insurance to which he is entitled under the War Risk Insurance Act until his earning capacity in his new chosen vocation has been demonstrated.

At Law. Action by De Witt T. Law against the United States. Judgment for plaintiff.

De Witt T. Law, of Missoula, Mont., in pro. per.

Ronald Higgins, Asst. U. S. Atty., of Helena, Mont., and E. H. Horton, of Washington, D. C., for the United States.

BOURQUIN, District Judge. This action involves a war risk insurance contract. Plaintiff enlisted in defendant's, army in June, 1917, the contract issued in February, 1918, and his injuries were received in battle in September, 1918. These latter were shell wounds, involving loss of his left arm at the shoulder, loss of some tissue of his left thigh, and neurasthenia. Theretofore and in the service he had developed flat feet. He is native-born and at enlistment was 24 years

old, sound, and of farm laborer vocation. Upon discharge, the Bureau of Insurance rated him of temporary total disability, and he was paid compensation accordingly. Later, in 1919, defendant provided him with vocational training in law, to continue four years, and compensation, $80 to $100 per month, which he accepted and has enjoyed. He contended, however, that he was entitled to payments by virtue of the contract of insurance. This defendant denied, and this action was begun in March, 1922, and tried in October, 1922, plaintiff his own counsel throughout.

From the evidence it does not appear reasonably probable that his flat feet are of permanent, if any, occupational disability. In respect to his neurasthenia, a physician in whose home plaintiff resided from October, 1919, to August, 1921, testifies by deposition in October, 1922, that it manifested itself by "trembling voice and mental distraction," and "it was permanent" in his opinion; that he made numerous examinations of plaintiff; that when the first was made in October, 1919, plaintiff could have performed no "concentration and work" "without rendering said nervous condition more serious" ; that "the proper treatment would have been absolute rest" ; that during said period of observation plaintiff's "capacity for concentration, and work remained about the same, but his ability to sleep was considerably impaired." He also testified that the injury to plaintiff's left thigh is permanent, and diminishes the leg's normal efficiency from 30 per cent. to 50 per cent. Another physician testified orally that plaintiff's neurasthenia is "mild," and that the injury to his thigh disables him 10 per cent.; cannot say how much permanent disability from it, but in an occupation requiring plaintiff to be on his feet would not "hinder, except to a minor extent."

At the time of trial, plaintiff in the law school of the University of Montana had studied more than three years, and, although yet of trembling voice, manifested no lack of power of concentration and no distraction, and upon his feet he moved about with facility, though he testified that the muscles of the left leg "knot" and from walking it becomes "stiff." It does not appear reasonably probable that plaintiff's neurasthenia is of permanent occupational disability, but it does thus appear that his injured thigh is. And that the loss of his left arm is of permanent occupational disability is obvious. Whether plaintiff's ailments and injuries reduce him to a state of "total permanent disability," within the intent and meaning of article 4 of the War Risk Insurance Act (40 Stat. 409), is the determinative issue.

Said act supersedes pension laws and their policy of gratuities, sounds in contract throughout, and is of unprecedented liberality. It creates a bureau and director, with express power (otherwise implied) to make all necessary rules to execute the act, but none "inconsistent with" it, grants allowances to families of all enlisted men, grants to officers and men, and their dependents, compensation based on death and disability reducing earning capacity not less than 10 per cent. (article 3), and for "greater protection" than this compensation affords offers to officers and men insurance against death or "total permanent disability" (article 4). The director is authorized to "deter-

mine upon and publish the full and exact terms and conditions of such contract of insurance," again, of course, to any extent reasonable and not inconsistent with the act.

In the latter is no definition or limitation of the term "total permanent disability," and after the contract in suit had issued and in March, 1918, the director made a "regulation" that "any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed, in articles 3 and 4, to be total disability," and deemed to be "permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life" of the disabled person. Thereafter, and in June, 1918, Congress amended both the compensation and insurance provisions of the act (40 Stat. 609), but again without defining or limiting the term "total permanent disability." In December, 1919, it again amended said act (41 Stat. 371), and in the compensation provisions inserted a proviso:

"That the loss of both feet, or both hands, or the sight of both eyes, or the loss of one foot and one hand, or one foot and the sight of one eye, or one hand and the sight of one eye, or becoming helpless and permanently bedridden shall be deemed to be total, permanent disability."

[1] The act, clearly enough, in its insurance feature was intended to afford the soldier the advantages of the ordinary life and accident insurance, which was no longer available to him save at rates proportionate to a soldier's risk and prohibitive to his purse. It is a substitute for a common, valuable, necessary, and well-known institution, both intended to serve the like purpose and to accomplish the like end, and in reason and the nature of things the contracts of both in so far as like in terms must be like in construction. As in any government contract, the act and contracts by virtue of it must be interpreted and construed by the same rules as are like statutes and contracts involving none but private parties.

The analogy between the contracts of this act and those of accident insurance is not close, for that amongst other variations the latter as a rule associate words of definition and limitation in respect to disability that the former do not. Nevertheless general rules of construction of accident insurance contracts have applicability to contracts like this at bar. Congress must have intended as it must have known, that as usual, resort would be had to all the usual aids to arrive at its intent and meaning.

[2] So in respect to this contract, as to those of accident insurance generally, the term "total permanent disability" must be taken in reasonable and practical (here, perhaps, even liberal) sense relative to the status of the beneficiary and to be determined largely by the circumstances of his particular case. The insurance, like enlistment, extends to all soldiers, of infinite diversity of ability and variety of vocation. It is to compensate them for earning capacity destroyed, the earning capacity the soldier had before its destruction.

[3] In determining as a question of fact the extent of the destruction and consequent disability, the inquiry is not to be restricted to the vocation the soldier may have followed, but extends to any other

gainful vocation that it is reasonably probable he can follow with reasonable effort and success. The soldier's capacity or ability to earn, and not merely the vocation in which he has earned, is the test of disability. A tea taster or singer, or the like, might suffer total permanent destruction of his special talent without just claim to any disability, for that he has capacity to successfully follow a multitude of other gainful occupations; or he might suffer like destruction of a hand, foot, eye, with like consequence, for that his earning capacity as tea taster, singer, or the like is unaffected. On the other hand, a common laborer, suffering like destruction of his ability for manual toil, might have no other ability or capacity to earn, and so be justly rated of total permanent disability, despite speculation and conjecture that he might become a tea taster, lawyer, doctor, artist, author, or philosopher, and of greater earning capacity than before, and despite however willing he be to make the effort.

In any case, when earning ability or capacity is destroyed to an extent that no substantial portion remains on its merits to serve demand and to secure market, there is total disability, and if it be reasonably probable that this status will long continue, is not temporary, the disability is total and permanent in legal contemplation, and within the intent and meaning of article 4 of the act; and, that status once determined, it will be presumed to continue so far as insurance is due it, until the end of totality or permanency is a proven fact. A common laborer, by dismemberment thus disabled from manual toil, is of total permanent disability in ordinary, reasonable, and practical meaning of the term and of article 4 aforesaid, however flattering the speculation or hope that in some learned career eventually he may become of greater earning capacity than before.

For reasons aforesaid, there is inability to formulate any general rule more definite than that of relativity and circumstances as aforesaid. Evidently Congress appreciated this truth, and not only refused to enact a general rule, but in passage of the act as it was when this contract issued rejected two of limitation, if not of definition, viz. one in the first amendment of the original act (40 Stat. 102 [Comp. St. 1917, Comp. St. Ann. Supp. 1919, § 514cc]), payment in case of "permanent disability which prevents the person injured from performing any and every kind of duty pertaining to his occupation"; and one in the bill as it first passed the House, payment "while disability is total, so as to make it impracticable for the injured person to pursue any gainful occupation." In literal interpretation, both of these would nullify the law in the matter of compensation for total disability, and to this extent would defeat its object.

[4] Incidentally, the first rejected definition was associated with a provision that loss of one arm would be rated at 65 per cent. of the permanent disability defined, but this provision was rejected with the definition. The act leaves it to the director to define the term "total permanent disability," and confers power of correction on the courts, if his definition be not reasonably within the intent and meaning of Congress. His attempt in that direction, by the regulation aforesaid, taken literally, is more extreme and destructive of the spirit of the act,

if possible, than either of those rejected by Congress as aforesaid. For he stipulates for the "impossible" and for the "certain," neither of which is a reasonable standard, exists but rarely in disputed facts, has any place in judicial determination. In the circumstances, it is not believed Congress by silence or amendment has accepted the director's regulation or approved it as a correct expression of congressional intent and meaning.

[5] The amendment aforesaid (41 Stat. 371), declaring certain injuries and condition shall be deemed total permanent disability, is subsequent to and cannot affect this contract, even if unreasonably construed to imply that none other injuries or condition would create that status. In the latter event it is new legislation, and not merely valid interpretation. And it is not to be overlooked that said amendment was enacted after war ended, fears abated, ardor cooled, and when the tendency was to evade, if not repudiate, generous promises to the soldiers theretofore made in the Insurance Act and otherwise. This congressional expression in December, 1919, is not a safe guide to that congressional intent and meaning in June, 1917.

[6] In view of the premises it is believed and found that, by and in consequence of the injuries received in service, plaintiff then was and yet is totally permanently disabled within the intent and meaning of article 4 of the act. It is not even suggested by the defense that he has substantial earning capacity that on its merits and not favored by quasi charity would serve demand and secure market.

[7] It is true that on occasion some exceptional men in unusual circumstances, injured like plaintiff, make way and place to substantial extent. Not in these, but in the average and ordinary, is the rule to determine disability. In fact the defendant rates plaintiff as totally disabled, but, since he accepts vocational training and compensation, may arrive at the bar, it rates him temporarily and not permanently totally disabled, and denies he is entitled to insurance. For this error the director's invalid regulation, counting on the "impossible" and on the "certain," is in part responsible, as is defendant's failure to recognize that it contracted to pay both compensation and insurance.

As the latter is to be paid only "during total and permanent disability," if and when plaintiff's ambition, industry, developed ability, and perseverance create new earning capacity as a lawyer, insurance payments to him will be no longer due; and that, however slowly business is secured for exercise of the new capacity, however long is his and the usual prenticeship in practice of more economy than law. The event is yet "on the knees of the gods," and impairs not his past and present right to insurance.

The consequence of any success from his extraordinary efforts, voluntarily made, and that could not be required, is not to be anticipated. The conclusion is that plaintiff is entitled to recover the stipulated installments of $57.50 per month from and after September, 1918, to date, or $3,335.

Judgment accordingly.